# EXHIBIT 6



# RAPAPORT
## DIAMOND REPORT

# GUIDE TO
# FANCY SHAPES

    

## Volume 2



# The Jubilant Crown

Gem International
15 West 47th Street
New York, NY 10036
Tel: 212.840.2111
Fax: 212.819.1400

The Jubilant Crown™ is about to make its debut at the JCK Show Las Vegas. The diamond is inspired by the Jubilee cut produced during the reign of Queen Victoria. The new cut is being introduced by Gem International, a leading manufacturer and importer based in New York City specializing in fine white diamonds ranging from .01 carats to 4 carats.



## PHYSICAL CHARACTERISTICS AND CUTTING ISSUES

The Jubilant Crown diamond enhances the beauty of an ordinary diamond, characterized by 16 additional facets to the crown; added scintillation, brilliance and dispersion; and a small table.

There are 73 facets in a Jubilant Crown diamond: 49 on the crown and 24 on the pavilion. The color grades of the stones range from D to K, with clarities from I1 up. Carat weights start at .40. Table sizes range from 35 percent to 45 percent. Total depth range is 62 to 66 percent.

Jubilant Crown diamonds are girdle-inscribed with the stone's name and official registration number. The stones are GIA and EGL certified.

## MARKETS AND MARKETING

The Jubilant Crown will be sold in middle- and high-end stores in the United States. It will be sold exclusively through Gem International, which will offer case displays and cooperative advertising.

## PRICING AND SUPPLY

In price, the Jubilant Crown will run approximately 10 percent within the market price of comparable round diamonds with no loss in diameter or overall size appearance.

The diamond will be unveiled at the JCK Las Vegas Show, May 30 through June 4, at booth number 43045.

## WHAT BUYERS SHOULD LOOK FOR

The sale of the Jubilant Crown in retail stores will be facilitated by its affordability as compared to most ideal cut diamonds. Consumers have responded well to its visual enhancements and the diamond's small table. It is suggested that retailers emphasize the beauty of the stone over the cert information, as well as the enhancement the cut lends to I1 and SI, I to K stones. ◇

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SHAMA GEMS, INC. doing business as GEM    :
INTERNATIONAL,

    :

                Plaintiff,

    :          Case No.

      -against-

    :

R & R GROSBARD, INC., ROBERT            **DECLARATION OF**
GROSBARD, RICHARD GROSBARD,    :    **JAYESH GANDHI**
and RITESH SHAH,

    :

                Defendants.

_____


MUMBAI             )
             : ss.:
INDIA              )

        JAYESH GANDHI declares as follows:

        1.      I am a senior diamond buyer for plaintiff Shama Gems, Inc., doing business as

Gem International ("Gem Int'l"), and have been employed in the diamond industry for the last 18

years. I submit this declaration in support of plaintiff's application for a preliminary injunction

with temporary restraints.

        2.      On or about April 3, 2007, at approximately 10:00 a.m., a messenger for our

diamond cutter Savji Patel, named Ghanshyam, delivered a box contained in a sealed envelope. I

provided the messenger with a receipt for the delivery.

        3.      Within five minutes of the delivery, I opened the package and discovered that the

shipment was sent in error. While our company's customary delivery would consist of 10 to 15

stones, the delivered box contained approximately 34 stones. I immediately called the cutter,

Savji Patel, to inform him of the mistake. Mr. Patel advised that he would have Ghanshyam

deliver the intended parcel, and requested that we return the misrouted shipment to the

messenger. Shortly thereafter, Ghanshyam returned with a second parcel, which appeared to be

the correct shipment and contained the appropriate number of diamonds.

4.     Upon closer inspection of the two boxes of diamonds, with the aid of a 10x

magnification jeweler's loupe, I and a co-worker, Milan Shah, a junior diamond buyer at our

company, independently concluded that Box 1 containing the 34 diamonds were cut in a *Jubilant*

*Crown®* pattern – albeit with a much lower grade of diamond – with the exception of a single,

high-grade diamond. Conversely, Box 2, the second delivery containing the smaller number of

stones also cut in the *Jubilant Crown®* pattern, had higher grade diamonds, but for one, which

was at the same lower grade as those contained in Box 1.

5.     I immediately called the cutter, Savji Patel, for an explanation and asked whose

goods were contained in Box 1. An evasive Patel told me to return the goods to the messenger

and that he would tell me the consignee's identity later.

6.     At approximately 11:00 a.m., I called my employer, Navin Shah, to advise him of

the foregoing events. At this time, I told him that I believed the misrouted diamonds contained

in Box 1 were intended for Remy Diamonds because the envelope containing that box indicated

the 24th Floor of our building, where Remy Diamonds' office was located.

7.     Mr. Shah instructed Milan Shah and I to inspect the diamonds again, but not to

return them to the cutter's messenger until he arrived at the office. I followed this direction and

declined at that time to release Box 1 to Ghanshyam.

8.     At this time, Yogesh Savani, a manager for Rindiam's diamond assortment

department and the broker who had originally put plaintiff in contact with the cutter Patel,

arrived at our office at the request, and in advance, of Navin Shah. Mr. Savani also inspected

samples of the diamonds contained in both boxes and could not discern any difference in cut

between those in Box 1 and the *Jubilant Crown*® cut diamonds in Box 2. Mr. Savani also called

Patel to persuade him to disclose the identity of the consignee, but Patel reiterated that he would

only divulge the name after the goods were returned to him.

9.    At approximately 11:30 a.m., Navin Shah arrived at the office and inspected the

two (2) sets of diamonds and also found no difference in the diamonds' cut. Mr. Shah then

directed me to release Box 1, containing the 34-odd diamonds, to the messenger, who had been

waiting in our office. We retained the one, lower grade Remy diamond that had been misplaced

in Box 2.

10.    That afternoon, I accompanied Navin Shah when he presented the Remy diamond

and a sample of the *Jubilant Crown*® diamond to Raju Shah (unrelated and a disinterested party)

of Venus Jewel, one of approximately 80 cutters in the world with a DTC sightholder

designation, at Raju's offices. Raju inspected the two diamonds and concluded that they were

identical.

11.    Upon our return to the office, I placed the lower grade diamond in the company

safe, where it remained until the time of its export to Gem Int'l's New York office on or about

April 10, 2007. From the time that I received the diamond from the messenger until the time the

diamond was placed in the safe, the Remy diamond was never out of my sight. I marked the

diamond with an erasable marker to easily distinguish it from other *Jubilant Crown*® cut

diamonds.

12.    That night, I attended dinner with Messrs. Savani, Patel and Navin Shah.

Notwithstanding his earlier representations, and Remy Diamonds' address appearing on the

shipment's envelope, Patel refused to disclose the other consignee's identity at dinner and, while claiming the two sets of diamonds were different, refused to explain the distinction. Finally, on the train ride home following dinner, Patel revealed to me that the distinction between the diamonds was the addition of 8 tiny "V" cuts on the girdle of the knock-off diamond.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 27 day of September, 2007.

_gandhi J. V._

JAYESH GANDHI

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAMA GEMS, INC. doing business as GEM                    :
INTERNATIONAL,

                                                          :

                              Plaintiff,                  :              Case No.

                -against-                                 :

R & R GROSBARD, INC., ROBERT                             :              **DECLARATION OF**
GROSBARD, RICHARD GROSBARD,                                              **NAVIN A. SHAH**
and RITESH SHAH,                                          :

                              Defendants.                 :

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

         NAVIN A. SHAH declares as follows:

         1.       I am a principal of plaintiff Shama Gems, Inc., doing business as Gem

International ("Gem Int'l"). I submit this declaration in support of plaintiff's application for a

preliminary injunction with temporary restraints.

         2.       On or about April 3, 2007, while traveling on unrelated business in Mumbai,

India, I received a call from an employee in my Mumbai office, Jayesh Gandhi, advising me that

a messenger from our local diamond cutter had mistakenly couriered an extra box containing

diamonds with the cut of the *Jubilant Crown*®, of which plaintiff is the exclusive, worldwide

licensee. Upon investigation, I discovered that the misdirected box was intended for our

competitor, R & R Grosbard, Inc. ("Grosbard"), doing business in India as Remy Diamonds,

with an office in the same building as our Mumbai office. In addition to this parcel of knock-off

diamonds, a single, sample *Jubilant Crown*® knock-off was also mixed with the actual shipment

of plaintiff's *Jubilant Crown*® product, received by my company in a subsequent delivery that same day.

3.    Upon learning about these deliveries, I instructed Mr. Gandhi and another employee, Milan Shah, to re-inspect the *Jubilant Crown*® and "Remy" diamonds until I arrived at the office.  I also asked Yogesh Savani, the gentlemen who had originally introduced me to our local diamond cutter, Savji Patel, to come by the office to discuss this situation.

4.    When I arrived at the office later that morning, I inspected the two sets of diamonds and could not discern any difference in the diamonds' cut.  Upon completing my inspection, I authorized the release of the box containing the diamonds intended for Grosbard, while retaining the box containing the *Jubilant Crown*® diamonds and the single *Jubilant Crown*® knock-off, which I came to later learn is referred to as the Remy diamond by Grosbard.

5.    While in Mumbai, on the same day that my office received the misrouted diamond, I presented the Remy diamond and a sample of the *Jubilant Crown*® diamond to Raju Shah (unrelated and a disinterested party) of Venus Jewel, one of approximately 80 cutters in the world with a DTC sightholder designation, at Raju's offices.  Raju inspected the two diamonds and concluded that they were identical.

6.    Later that evening I had dinner with Messrs. Savani, Patel and Gandhi in attempt to learn the details of that morning's diamond shipment.  Mr. Patel, however, refused to discuss the matter.

7.    Since taking possession of the Remy diamond in Mumbai, the diamond remained in my care, custody and control until it was overnighted to Gem Int'l offices at 15 West 47th Street, Suite 905, New York, New York on or about April 10, 2007.  Since its transport to New

York, the Remy diamond has been isolated and kept under lock and key at our New York offices.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 27 day of September, 2007.

_Navin A. Shah_
NAVIN A. SHAH

# EXHIBIT 9

# T·U·R·I

## PREPARED IN ANTICIPATION OF LITIGATION

October 8, 2007

Christopher B. Turcotte, Esq.
575 Madison Avenue, 10th Floor
New York, New York 10022

*Re*: United States Patent No.: D444,097 S
COMPARATIVE ANALYSIS OF JUBILANT CROWN & REMY DIAMONDS

Dear Mr. Turcotte:

You have requested my opinion concerning the comparison of the above referenced patent with a diamond identified as the REMY DIAMOND.

In deriving my opinion I have considered the above referenced patent, a diamond identified as the JUBILANT CROWN, *i.e.*. the product covered by the above referenced patent, and the diamond identified as the REMY DIAMOND.

On the basis of my review I am of the opinion that a lay person or a gemologist would be unable to discern any difference between the two (2) above diamonds when viewed by the naked eye. Additionally, I am of the opinion that a lay person would be unable to discern any difference between the two (2) diamonds when viewing the diamonds under a 10x magnification. It is also my opinion that it is extremely unlikely that a jeweler using a 10X triplex loupe to examine the two (2) diamonds presented would be able to discern the difference between the Jubilant Crown and the Remy Diamond.

BACKGROUND:

This report is prepared at the request of Christopher B. Turcotte, an attorney representing Gem International in patent infringement litigation related to a patented faceting design for the crown facets of a round diamond. I was initially contacted by Bjorn J. Holubar who was seeking an expert in the jewelry industry to examine two (2) diamonds and render an opinion on differences in their faceting patterns.

I initially examined the diamonds at the offices of Christopher Turcotte, bringing a triplex 10X diamond loupe and diamond tweezers with me.

# T·U·R·I

A diamond in its natural, rough condition when it is first taken from the ground is most often a dull and abraded milky looking translucent stone that is virtually always asymmetrical, most resembling a common stone. If the stone comes directly from the ground, it often has a rough surface; if its source is alluvial, the edges tend to be a bit rounded off. In some instances one or more of the surface crystal planes will be present.

In order to achieve the look and appearance associated with the diamond as a valuable gem stone, it must be cut, faceted, and polished. The modern, round, brilliant cut diamond has 58 facets. This is the diamond faceting pattern that is used for the vast majority of all round diamonds. In recent years numerous diamond companies have introduced patented faceting patterns, usually claiming to achieve a more scintillating or beautiful appearance, as well as seeking to establish a business advantage based on the marketplace exclusivity afforded by a patent.

I made a preliminary examination under ambient light of each diamond individually with the naked eye, and then examined each diamond with the referenced diamond loupe. Based upon this examination I concluded that with the naked eye there was no eye-visible difference in the faceting pattern between the two (2) diamonds.

I then examined each diamond with the 10x diamond loupe under the ambient light. Prior to this examination I had been shown the faceting pattern for the Jubilant Crown diamond. After looking at each diamond several times for a period of minutes, I was unable to discern a difference between the two (2) diamonds under 10 x magnifications.

I next considered whether various setting techniques would cover the upper bezel facets on a diamond, and I concluded that all setting techniques will significantly obscure the upper bezel facets, especially when viewed from the side, thus further hindering any possibility of discerning a difference between the two (2) diamonds. Additionally the bezel, burnish, and pave techniques in particular, will obscure the upper bezel facets more than prong settings.

ANALYSIS

On August 30, 2007, in my offices, I again examined both the Remy Diamond and Jubilant Crown diamond samples I had previously received. For these examination I was seated at desk with a triple daylight fluorescent lamp, which is the standard lighting within the trade for examination and grading of diamonds.

48 WEST 48TH STREET, SUITE 401
NEW YORK, NY 10036
PHONE (212) 331-8973
FAX (212) 768-0124

# T·U·R·I

Approximately 90% of the focus of an examination of a diamond by a professional within the jewelry trade is from above. Outside of members of the jewelry trade—that is the consuming public—the percentage of the viewing of a diamond from above is well in excess of 90%. This view from above will provide most of the information to the viewer relative to color, clarity, cut and symmetry. In the jewelry trade the diamond is examined from the side very briefly to check on the width of the girdle and to see if the upper and lower bezel facets line up. An equally brief examination is made of the pavilion to verify any inclusions seen from above and as a second check on color.

I examined each of the two (2) diamonds with the naked eye, holding them with diamond tweezers and rotating them slowly under a triple daylight bulb table fluorescent lamp. I could not see any difference in the crown faceting pattern in this examination.

Subsequently, I examined the diamonds under a triple daylight table fluorescent lamp with a 10X loupe, and even knowing what to look for, it was difficult to locate.

Subsequent to my examination I had the diamonds examined by an independent 3rd party who is a GIA Graduate Gemologist (1983) and worked for three (3) years at the GIA as a diamond grader (1980 – 1983), and is currently employed as a diamond picker and occasionally as a diamond buyer.

I submitted the two (2) diamonds to this individual and asked him to examine them and identify differences between them, if any, under three different circumstances: the naked eye examination 10 X triplet loupe and 20 X microscope. I did not indicate what type of differences he should look for (cut, color, clarity) nor did I indicate if there were in fact any differences to discover. As of this writing I have not yet disclosed to him the nature of the differences.

In summary, he did not identify any differences related to the diamonds' crown facets under either the naked eye examination or the 10x loupe examination. Additionally, even using a 20x microscope he did not indicate that there were any extra facets.

OPINIONS AND CONCLUSIONS

The Jubilant Crown diamond is a round brilliant cut diamond with additional crown facets and a significantly smaller table facet as compared to a modern, brilliant cut. Both the Jubilant Crown diamond and the Remy Diamond use the same pavilion faceting pattern as a modern brilliant cut.

When viewed from above, the Jubilant Crown diamond is visibly different in appearance from a modern round brilliant cut. It has more of the "broken glass" appearance than that of a round brilliant, which is due to the greater number of crown facets in the Jubilant

# T·U·R·I

Crown diamond. To a trained eye, it is immediately apparent that the size of the Jubilant Crown table facet is much smaller than that of a modern brilliant diamond. No opinion is expressed as to whether these differences are more appealing or desirable.

In comparing the samples provided of the Jubilant Crown diamond to the Remy Diamond, when both are viewed from above, it is my opinion that with the naked eye the difference in the faceting pattern is indiscernible, be it a consumer or jewelry professional.

In comparing each of the sample diamonds provided under a 10x loupe, it is my opinion that without coaching, no typical consumer would be able to distinguish these diamonds from one another based on the faceting pattern alone. By a "typical consumer" I mean someone without any current or prior experience or training in the diamonds or the jewelry trade.

It is also my opinion that most jewelry professionals would also not identify the differences in the faceting patterns between these two diamonds for four reasons:

1. The extra facets of the Remy Diamond are so insignificant in size compared to the other crown facets;
2. Smaller diamonds are usually examined in rapid succession;
3. To the extent the cut is examined, it would be for symmetry and proportions which are revealed principally through the table facet, and
4. Diamond examination from the side—if none at all—is cursory.

Equally important is that diamonds of this size are rarely, almost never, viewed by consumers outside of a mounting. More often they would be seen in a pave or bezel setting, both of which would obscure the faceting pattern around the girdle. More particularly, pave setting would make it impossible to view from the side, and a bezel setting would completely cover the girdle and a substantial portion of the upper bezel facets. The same would be true even if these stones were substantially larger and pave or bezel set. A burnish set stone would have the same effect as a bezel setting; completely covering the girdle and a substantial portion of the upper bezel facets. If a larger stone were prong set, the upper bezel facets would be visible, although the prongs would substantially interfere with a side view examination—especially a four prong setting which would most likely cover four of the eight upper bezel facets. However, the fact of a larger stone would not alter the reality that 90% of the examination would be from above.

In summation, it is beyond credibility to believe that a consumer would be able to distinguish between the Jubilant Crown and Remy Diamond, even with the aid of a 10x loupe. It is also my opinion that only in the rarest of circumstances would a member of

# T · U · R · I

the jewelry trade notice the extra facets on the Remy Diamond without coaching or a suggestion to search for a difference.

Very truly yours,

Andrew Turi

48 WEST 48TH STREET, SUITE 401
NEW YORK, NY 10036
PHONE (212) 331-8973
FAX (212) 768-0124

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHAMA GEMS, INC. doing business as GEM
INTERNATIONAL,

              Plaintiffs,

        -against-

R & R GROSBARD, INC., ROBERT
GROSBARD, RICHARD GROSBARD,
and RITESH SHAH,

              Defendants.

---

Case No.

**DECLARATION OF
SANJAY KHAPRE**

MUMBAI            )
                   : ss.:
INDIA               )

SANJAY KHAPRE declares as follows:

1.     I am a senior diamond buyer for plaintiff Shama Gems, Inc., doing business as

Gem International ("Gem Int'l"), and have been employed in the diamond industry for more than

25 years. I was employed by plaintiff in India from approximately 1990 through April 2006, and

most recently was rehired by plaintiff in April 2007, where I continue through the present to be

employed. I submit this declaration in support of plaintiff's application for a preliminary

injunction with temporary restraints.

2.     In or about June 2006, I became employed by Remy Diamonds, the Indian

operation of defendant R & R Grosbard ("Grosbard"), as a senior diamond assorter. I was hired

by brothers Ritesh and Amish Shah.

3.     During my tenure with Remy Diamonds, I was totally unaware of the company's manufacture and marketing of a "Remy cut" diamond until, by chance, I first learned of it during a November 2006 visit to Grosbard's New York office.

4.     During this New York visit, I overheard a number of Grosbard employees on the telephone attempting to sell the Remy diamond to retailers. Upon my return to India, in or about November 2006, a Remy employee, Sachin, showed me a Remy diamond, representing it as being very unique; I immediately recognized it as plaintiff's *Jubilant Crown®* cut.

5.     In December 2006, I terminated my employment with Remy Diamonds. At that time, Ritesh Shah tried to persuade me to return by boasting about the prospects for the Remy diamond. Ritesh made it a point of telling me that the Remy was different than "Navin [Shah's] cut" but that I was to tell no one this. He also told me that he intended to market the Remy diamond to the *Jubilant Crown®*'s clientele.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 27 day of September, 2007.

_____
SANJAY KHAPRE

# EXHIBIT 11

# The Law Office of Christopher B. Turcotte, P.C.

575 Madison Avenue, Suite 1006, New York, New York 10022

**Christopher B. Turcotte**
Direct Dial: (212) 937-8499
Direct Fax: (646) 417-5851
E-Mail: cturcotte@cbtlaw.com

June 18, 2007

**VIA CERTIFIED MAIL**
R&R Grosbard, Inc.
1185 Avenue of the Americas
New York, New York 10036
Attention: Robert Grosbard

Re:    Cease-and-Desist Notice

Dear Mr. Grosbard:

This firm represents the respective inventor and patent holder of U.S. Design Patent No. D444,097 S ("the '097 Patent"), as well as the patent's exclusive American licensee and distributor, Shama Gems, Inc., d/b/a Gem International.  The '097 Patent (see attached) relates to the crown design for round-facetted gemstone(s).

It has come to our attention that you are infringing upon the '097 Patent through your sales of a "Remy" cut gemstone.  Your actions and omissions violate our clients' statutory and common-law rights and protections.

You are requested to CEASE & DESIST the manufacture, use and sale of the product identified as "Remy" in any capacity.  To further effect same, you must:

1)    immediately withdraw all advertising in any media, all products, catalogues, brochures, Internet or other web advertising using or otherwise referring to "Remy" cut; and

2)    within fourteen (14) days, produce a full accounting of sales of your "Remy" cut, including manufacturer's costs, wholesale price, retail price and your net revenue derived therefrom.

Should the above not be complied with as prescribed, equitable and legal action will be initiated to enjoin and remedy further injury.

If you have any questions please do not hesitate to contact me.

Very truly yours,

Christopher B. Turcotte

# EXHIBIT 12

HEDMAN & COSTIGAN, P.C.

ATTORNEYS AT LAW

1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036-2646

JAMES V. COSTIGAN
KENNETH F. FLOREK
ALAN B. CLEMENT
MARTIN P. ENDRES
KATHLEEN A. COSTIGAN
JOHN F. VOLPE
KATHARINE G. LOVING
NICHOLAS P. CHIARA
MATTHEW J. SOLOW
JORDAN G. GARNER

June 28, 2007

EDWARD A. HEDMAN
1927-2004

TELEPHONE
(212) 302-8989

TELECOPIER
(212) 302-8998

E-MAIL
mail@hgcpatent.com

OF COUNSEL
CHARLES A. MUSERLIAN

BY FACSIMILE AND FEDEX

Christopher B. Turcotte, Esq.
575 Madison Avenue Suite 1006
New York, NY 10022

Re .:   R&R Grosbard, Inc.
        1185 Avenue of the Americas

Dear Mr. Turcotte:

This letter is being sent in response to your letter of June 18, 2007.

Your charge that the sale of the Remy diamond infringes U.S. Design Patent No. D444,097 S (the '0907 patent) is so devoid of merit that it borders on being frivolous and makes one wonder if you have been provided with an actual Remy diamond for your consideration. The ornamental design of the '097 patent requires that the faceted gemstone have 49 facets while the Remy diamond has 57 facets. In addition, due to the larger number of facets, the side profile of the Remy diamond is distinctly different from the side profile of the design of Fig. 2 of the '097 patent. The Remy diamond also lacks the specific girdle design that is set forth in Fig. 2 of the '097 patent. The angles of the facets that were set out on the enclosure to your letter are not present in the Remy diamond.

You have given no details of the bases of your charges that your clients' "common law rights and protections" have been violated".

I assume that when you reconsider the structure of the Remy diamond and the '097 patent, that you will withdraw your charges of infringement. You should understand that R & R Grosbard, Inc. takes this matter very seriously and that it is prepared to immediately pursue its legal rights to protect itself.

Very truly yours,

James V. Costigan

# EXHIBIT 13

# T · U · R · I

ANDREW TURI
48 West 48th Street
New York, NY
10036

## EDUCATION

Syracuse University – 1973 – B.A., Political Science – Cum Laude
University of Denver – 1976 Juris Doctorate
Colorado University at Denver – 1981 – Masters in Public Administration
Gemological Institute of America – circa 1982 – Diamond Grading Course

## BAR ADMISSIONS

Colorado: July, 1976
Washington, D.C.: May, 1978
New York: March, 1983

## EMPLOYMENT HISTORY

1976 – 1979: Western Governors Task Force on Regional Policy
Management
Western Governors Policy Office

Position: Legal Counsel and Policy Analyst

1981 – Present: Charles Turi Jewelry Manufacturing Company, Inc.

Positions: Salesman
General Manager
Owner

Clients: Tiffany
Van Cleef & Arpel
Neiman Marcus

48 WEST 48TH STREET, SUITE 401
NEW YORK, NY 10036
PHONE (212) 331-8973
FAX (212) 768-0124

# T · U · R · I

## PUBLICATIONS

Masters Thesis: University of Denver Administrative Law Journal –
1981/82

Retail Diamond Training Manual: Selling Luxury Diamonds - 2004

48 West 48th Street, Suite 401
New York, NY 10036
Phone (212) 331-8973
Fax (212) 768-0124