UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAMA GEMS, INC., doing business as GEM
INTERNATIONAL,

                        Plaintiff,

        -against-

R & R GROSBARD, INC., ROBERT
GROSBARD, RICHARD GROSBARD,
and RITESH SHAH,

                      Defendants.

Case No. 07 Civ. 9384 (RJS)

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF WITH TEMPORARY RESTRAINTS

On Memorandum:

    Christopher B. Turcotte, Esq.
    Bjorn J. Holubar, Esq.

LAW OFFICE OF CHRISTOPHER B. TURCOTTE, P.C.
575 Madison Avenue, Suite 1006
New York, New York 10022
(212) 937-8499
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... (ii)

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF RELEVANT FACTS ............................................ 1

LEGAL ARGUMENT

    PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED
    WHERE THE MOVANT WILL SUFFER IRREPARABLE HARM
    AND IS REASONABLY LIKELY TO SUCCEED ON THE MERITS .......... 5

    A.  Plaintiff Has Established the Likelihood of Success on the Merits ....... 6

    B.  Plaintiff Has Established Irreparable Injury ............................ 11

    C.  Balance of Hardships Favors Plaintiff ............................... 16

    D.  Defendants' Conduct Creates an Adverse Impact on Public Interest ...... 16

CONCLUSION ..................................................................... 17

## TABLE OF AUTHORITIES

Cases

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) ...................... 6

*BigStar Entertainment v. Next Big Star, Inc.*, 205 F.Supp.2d 185 (S.D.N.Y.2000)...................... 6

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.Supp.2d 217 (S.D.N.Y. 2004) ......... 15

*Collagenex Pharmaceuticals, Inc. v. Ivax Corp.*, 375 F.Supp.2d 120 (E.D.N.Y. 2005)............. 6

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998)....................... 9

*Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F.Supp.2d 372

    (S.D.N.Y. 2003)................................................................................... 5, 11, 16, 17

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722 (2002)............... 14-15

*Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F.Supp.2d 412 (S.D.N.Y. 2004) ................... 15

*Giantceutical, Inc. v. Ken Mable, Inc.*, 356 F.Supp.2d 374 (S.D.N.Y. 2005) ..................... 2, 5, 11

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511 (1872) ...................................................... 13

*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950) ............... 14, 15

*Greenpoint Financial Corp. v. The Sperry & Hutchinson Co., Inc.*,

    116 F.Supp.2d 405 (S.D.N.Y. 2000)................................................................... 5-6

*Int'l News Service v. Associated Press*, 248 U.S. 215 (1918) ......................................... 17

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27 (2d Cir. 1995) ................... 15

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,

    348 F.Supp.2d 165 (S.D.N.Y. 2004).................................................................... 8

*Kraft General Food, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123 (S.D.N.Y. 1993)......... 10

*Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir. 1992) ..................................... 10

*Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed.Cir. 1988) ............................. 13-14

*Minerals Technologies Inc. v. Omya Ag*, 339 F.Supp.2d 528 (S.D.N.Y. 2004) ..................... 5

*Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F.Supp. 470 (S.D.N.Y. 1998)....................... 8

*Omega, S.A. v. S & N Jewelry Inc.*, 1992 WL 142746 (S.D.N.Y. June 8, 1992) ................... 9, 10

*Princeton Graphics Operating, L.P. v. NEC Home elecs. (U.S.A.), Inc.*,

    732 F.Supp. 1258 (S.D.N.Y. 1990)................................................................... 8

*Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed.Cir. 1994) .................................. 5

*Register.com, Inc., v. Verio, Inc.*, 126 F.Supp.2d 238 (S.D.N.Y. 2000) ......................... 5

*Schnadig Corp. v. Gianes Mfg. Co.*, 494 F.2d 383, 391-92 (6th Cir. 1974) ................................. 14

*SEB, S.A. v. Montgomery Ward & Co., Inc.*, 137 F.Supp.2d 285 (S.D.N.Y. 2001)……...……..... 6

*Swatch, S.A. v. Siu Wong Wholesale*, 1992 WL 142745 (S.D.N.Y. June 8, 1992) ................. 9, 17

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,

    279 F.3d 1357 (Fed. Cir. 2002) ....................................................................................... 6

*Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481 (Fed. Cir. 1998) ……............................. 2

*Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981)……………………….……….9, 17

*WarnerVision Entertainment v. Empire of Carolina, Inc.*, 101 F.3d 259 (2d Cir. 1996)…..…...... 5

*Weindling Int'l v. Kobi Katz, Inc.*, 2000 WL 1458788 (S.D.N.Y. Sept. 29, 2000) ................ 12-13

*Winans v. Denmead*, 56 U.S. (15 How.) 330 (1854)………........................................ 14

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) .................................................... 8

*Yurman Design, Inc. v. PAJ, Inc.*, 93 F.Supp.2d 449 (S.D.N.Y. 2000) ……………............... 10, 12

## Statutes

35 U.S.C. § 283 ....................................................................................................................... 5

35 U.S.C. § 282 ....................................................................................................................... 6

35 U.S.C. § 173 ..................................................................................................................... 11

## PRELIMINARY STATEMENT

In this case, the defendant R& R Grosbard ("Grosbard"), in conjunction with its principals and/or agents Robert Grosbard, Richard Grosbard and Ritesh (aka "Ricky") Shah, have conspired to misappropriate and infringe upon a unique and highly regarded jewel design patent by exactly replicating its structure cut-for-cut, or more accurately "facet" for facet – and then attempting to create a superficial distinction by adding eight (8) inconsequential, microscopic facets at the very outer-edges of the jewel's crown, where the deviation, even if it could be discerned by the naked eye or magnification – which, as confirmed by expert analysis, it *cannot* – would be substantially if not totally obscured by the jewel's setting.

This deliberate and overt attempt to co-opt the plaintiff's novel and unique protected design constitutes patent infringement, Lanham Act violations and unfair competition, as well as violations of New York statutory and common law, and given the defendants' brazen and systematic efforts to cause irreparable harm to plaintiff, with no reasonable expectation of success on the merits, warrants the imposition of an immediate, preliminary injunction.

## STATEMENT OF RELEVANT FACTS

On or about June 26, 2001, Edwin B. Cutshall ("Cutshall") obtained a United States design patent (Patent No. US D444,097 S, hereinafter "the `097 Patent"), having a claim directed to an ornamental design for a crown of a round facetted gemstone. *See* Copy of Design Patent No. US D444,097 S annexed to Declaration of Christopher B. Turcotte dated October 18, 2007 ("Turcotte Decl."), as Exhibit "1".

Subsequently, on or about May 28, 2002, Cutshall entered into a licensing agreement with Shama Gems, Inc., a New York corporation doing business as Gem International ("Gem Int'l"), whereby Gem Int'l was granted sole, exclusive, worldwide rights to manufacture, market and sell *diamond* products made in accordance with the `097 Patent ("Agreement"). *See*

Agreement dated May 28, 2002 annexed to Turcotte Decl. as Exhibit "2", at ¶2.1; Declaration of

Edwin B. Cutshall dated September 26, 2007 ("Cutshall Decl."), annexed to Turcotte Decl. as

Exhibit "3", at ¶6; Declaration of Parag Shah dated October 5, 2007 ("Parag Shah Decl."),

annexed to Turcotte Decl. as Exhibit "4", at ¶2.  The Agreement provides that Gem Int'l is

empowered to enforce any of the '097 Patent's intellectual property rights worldwide.[1]  *See*

Exhibit "2", at ¶7.

Since entering into the Agreement, Gem Int'l has and continues to actively manufacture,

market and sell loose and mounted diamonds, utilizing the '097 Patent, under the trademarked

*Jubilant Crown*® name.  By virtue of plaintiff's considerable economic investment, the *Jubilant*

*Crown*® has gained national prominence, recognition and good will with the purchasing public,

with advertisements appearing in such periodicals as *Harper's Bazaar*, *Town & Country*, *W*

*Magazine* and *Modern Bride*, as well as its inclusion in *Rapaport Diamond Report*, the industry's

leading, weekly wholesale diamond price list used by dealers worldwide to track market price

fluctuations.  *See* Advertisements and *Rapaport Diamond Report* excerpt annexed to Turcotte

Decl., at Exhibits "5" and "6", respectively; Exhibit "4", Parag Shah Decl., at ¶3.

On or about April 3, 2007, while traveling on unrelated business in Mumbai, India, Gem

Int'l principal Navin Shah received a call from an employee in his Mumbai office advising him

that a messenger from their local diamond cutter had mistakenly couriered an unexpected box

containing diamonds with the cut of the *Jubilant Crown*®.  *See* Declaration of Jayesh Gandhi

dated September 27, 2007 ("Gandhi Decl."), annexed to Turcotte Decl. as Exhibit "7", at ¶¶2, 6;

---

[1] As Cutshall's exclusive worldwide licensee and a holder of all substantial rights under the patent, Gem Int'l has standing to defend or bring affirmative claims in this action. *See Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481, 1483-84 (Fed. Cir. 1998); *Giantceutical, Inc. v. Ken Mable, Inc.*, 356 F.Supp.2d 374, 377 (S.D.N.Y. 2005)("A party has standing to bring an action for patent infringement only if it is the patentee, a successor in title to the patentee, or an exclusive licensee of the patent at issue").

Declaration of Navin A. Shah dated September 27, 2007 ("Navin Shah Decl."), annexed to Turcotte Decl. as Exhibit "8", at ¶2. Upon investigation, Mr. Shah and his employee discovered that the misdirected box was intended for a Gem Int'l competitor, R & R Grosbard, Inc. ("Grosbard"), doing business in India as Remy Diamonds Private Ltd. *See* Gandhi Decl., annexed to Turcotte Decl. as Exhibit "7", at ¶¶3-6; Navin Shah Decl., annexed to Turcotte Decl. as Exhibit "8", at ¶2.

As a result of additional investigation, plaintiff learned that Ritesh (aka "Ricky") Shah, who worked as a Gem Int'l salesman from approximately November 2000 through November 2005, began employment with Grosbard in or about early 2006. *See* Parag Shah Decl. annexed to Turcotte Decl. as Exhibit "4", at ¶6. Upon further information and belief, Ricky Shah, who had ready access to the *Jubilant Crown*® designs and diagrams, appropriated and represented the design patent as his own and persuaded Grosbard to use the design in its diamond production, marketing it as the "Remy Diamond", with Grosbard misrepresenting to retailers that it had either secured the design patent rights or that the patent was pending. *Id.* In a transparent yet ineffective attempt to distinguish the *Jubilant Crown*® diamond from the Remy Diamond, the defendants made eight (8) inconsequential "V" cuts to the outermost edge of the diamond's crown (*see* Gandhi Decl., annexed to Turcotte Decl. as Exhibit "6", at ¶12), although these additional facets are undetectable by the naked eye, or even with a powerful microscopic lens, and are concealed by the diamond's setting. *See* Expert Report of Andrew Turi dated October 8, 2007 ("Turi Expert Report"), annexed to Turcotte Decl. as Exhibit "9". Notably, Ricky Shah has told at least one employee that the Remy Diamond is distinct from "Navin [Shah]'s cut", yet cautioned that employee not to disclose this information to anyone and further told this employee that he intended to market the Remy Diamond to plaintiff's *Jubilant Crown*®'s clientele. *See*

3

Declaration of Sanjay Khapre dated September 27, 2007 ("Khapre Decl.") annexed to Turcotte

Decl. as Exhibit "10", at ¶5. This employee, Sanjay Khapre, who has worked as a diamond

assorter and buyer in the industry for more than 25 years, has worked for both Gem Int'l and

Grosbard and had the opportunity to compare the Remy Diamond with the *Jubilant Crown*® cut,

immediately recognized the Remy Diamond to be a replica of the latter. *Id.* at ¶4.

Notwithstanding plaintiff's patent rights and the terms of the foregoing agreements, and

its having been served with notice (*see* Cease-and-Desist Notice dated June 18, 2007, annexed to

Turcotte Decl. as Exhibit "11"), defendants, by their counsel's own admission, has to this very

day engaged in the manufacture, import, export and sale of the Remy Diamond, made in

accordance with the '097 Patent. *See* Defense Counsel's Letter dated June 28, 2007 annexed to

Turcotte Decl. as Exhibit "12". Multiple individuals who have been employed in the diamond

industry for 20 or more years, including persons who have attained certification from and/or

worked for the gold-standard Gemological Institute of America (GIA) or who have attained the

rarefied DTC sightholder status, are unable to discern any difference between the two diamonds

– even with the aid of a 10X triplex jeweler's loupe. *See* Turi Expert Report, annexed to

Turcotte Decl. as Exhibit "9"; Gandhi Decl., annexed to Turcotte Decl. as Exhibit "6", at ¶10;

Navin Shah Decl., annexed to Turcotte Decl. as Exhibit "8", at ¶5.

As recently as June 2007, Grosbard marketed its *Jubilant Crown*® knockoff – the Remy

Diamond – at a substantial Las Vegas tradeshow. *See* Parag Shah Decl. annexed to Turcotte

Decl. as Exhibit "4", at ¶7. Multiple buyers attending the tradeshow confused the Remy

diamond with the *Jubilant Crown*® diamond. *See* Parag Shah Decl. annexed to Turcotte Decl.

as Exhibit "4", at ¶¶7-10. The defendants, through solicitation of plaintiff's clients,[2] have caused

plaintiff lost revenue in excess of $250,000 annually; moreover, Grosbard's infringement has

deprived plaintiff of lost business opportunities, resulting in losses of no less than an additional

$1 million annually. *See* Parag Shah Decl. annexed to Turcotte Decl. as Exhibit "4", at ¶¶12-13.

## ARGUMENT

### PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED
### WHERE THE MOVANT WILL SUFFER IRREPARABLE HARM
### <u>AND IS REASONABLY LIKELY TO SUCCEED ON THE MERITS</u>

Injunctive relief in patent cases is authorized by 35 U.S.C. § 283. In order to obtain

preliminary injunctive relief in a patent case, a movant must demonstrate (1) "reasonable

likelihood of success on the merits"; (2) "the irreparable harm the movant will suffer if

preliminary relief is not granted"; (3) "the balance of hardships tipping in its favor"; and (4) "the

adverse impact on the public interest." *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250

F.Supp.2d 372, 381 (S.D.N.Y. 2003)(quoting *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552,

1555 (Fed.Cir. 1994); *see also Giantceutical, Inc. v. Ken Mable, Inc.*, 356 F.Supp.2d 374, 379

(S.D.N.Y. 2005); *Minerals Technologies Inc. v. Omya Ag*, 339 F.Supp.2d 528, 531 (S.D.N.Y.

2004). "[A] party must establish both of the first two factors, at minimum, in order to prevail."

*Id.* at 531; *Giantceutical, Inc.*, 356 F.Supp.2d at 379-80.

"The purpose of a preliminary injunction is to keep the parties, while the suit is pending,

as much as possible in the respective positions they occupied when the suit began and to preserve

the Court's ability to render a meaningful decision after a trial on the merits." *Register.com,*

*Inc., v. Verio, Inc.*, 126 F.Supp.2d 238, 245 (S.D.N.Y. 2000)(citing *WarnerVision Entertainment*

*v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996)). To obtain an injunction, the

---

[2] As already noted, a former employee of the defendants, Sanjay Khapre, testified that the defendants "intended to market the Remy diamond to the *Jubilant Crown*®'s clientele." *See* Khapre Decl. annexed to Turcotte Decl. as Exhibit "10", at ¶5.

movant need not demonstrate that "success is certain, only that the probability of prevailing is 'better than fifty percent.'" *Greenpoint Financial Corp. v. The Sperry & Hutchinson Co., Inc.*, 116 F.Supp.2d 405, 408 (S.D.N.Y. 2000)(quoting *BigStar Entertainment v. Next Big Star, Inc.*, 205 F.Supp.2d 185 (S.D.N.Y.2000)); *see also SEB, S.A. v. Montgomery Ward & Co., Inc.*, 137 F.Supp.2d 285, 290 (S.D.N.Y. 2001)(plaintiff's "showing of infringement satisfie[d] the preponderance of the evidence standard for obtaining a preliminary injunction")(citations omitted). This Court has jurisdiction "to enforce its preliminary injunction and to prevent further infringement." *Id.* at 289 (citations omitted).

A. Plaintiff Has Established the Likelihood of Success on the Merits

1. Patent Infringement/Doctrine of Equivalents

"To demonstrate a likelihood of success on the merits, the movant must show that . . . it will likely prove the validity of the patent at issue, and infringement of the patent by the party opposing the motion." *Collagenex Pharmaceuticals, Inc. v. Ivax Corp.*, 375 F.Supp.2d 120, 135 (E.D.N.Y. 2005)(citing *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). Like utility patents, design patents are presumptively valid. 35 U.S.C. § 282. Here, based on conclusive documentary evidence – specifically, the original patent and plaintiff's May 2002 exclusive licensing agreement – Gem Int'l establishes the '097 Patent's *prima facie* validity and enforceability. Moreover, gemologist/jeweler Andrew Turi's expert report speaks to the originality of the patent design. *See* Turi Expert Report annexed to Turcotte Decl. as Exhibit "9", at 3-4 (describing the difference of the patented *Jubilant Crown®* diamond from the typical modern brilliant cut diamond).

Demonstrative of defendants' infringement of Gem Int'l's '097 Patent, Turi's finding

that defendants' diamond cuts are indistinguishable from Gem Int'l's '097 Patent to the naked

eye, coupled with the testimony of inventor Edwin Cutshall and former Remy Diamond

employee Sanjay Khapre, leaves no doubt that plaintiff has established patent infringement and,

accordingly, success on the merits.  First, relative to originality, Cutshall attests to "spen[ding]

weeks conceiving and ultimately configuring the '097 Patent, based on trial and error methods

and my then 25-year experience in gemstone design.  The patent is truly unique insofar as the

ordinary round cut diamond has 58 facets, whereas the '097 Patent is characterized by 16

additional facets to the crown, resulting in added scintillation, brilliance and dispersion."  *See*

Cutshall Decl. annexed to Turcotte Decl. as Exhibit "3", at ¶4.  Moreover, expert Andrew Turi

confirms that while the 58-facetted pattern "is used for the vast majority of all round diamonds"

(*see* Exhibit "9" to Turcotte Decl., at 2), "the *Jubilant Crown*® diamond is visibly different in

appearance from a modern round brilliant cut."  *See* Exhibit "9" to Turcotte Decl., at 4.

Relative to patent infringement, Andrew Turi, principal of a family-owned jewelry

manufacturer that has served clients such as Tiffany, Van Cleef & Arpel and Neiman Marcus for

more than 50 years,[3] upon inspecting the two diamonds at issue is

> of the opinion that a lay person or a gemologist would be unable to discern any
> difference between the two (2) above diamonds when viewed by the naked eye.
> Additionally, I am of the opinion that a lay person would be unable to discern any
> difference between the two (2) diamonds when viewing the diamonds under a 10x
> magnification.  It is also my opinion that it is extremely unlikely that a jeweler
> using a 10X triplex loupe to examine the two (2) diamonds presented would be
> able to discern the difference between the Jubilant Crown and the Remy
> Diamond.

---

[3] A copy of expert Andrew Turi's *curriculum vitae* is annexed to the Turcotte Decl. as Exhibit
"13".  Mr. Turi will be prepared to testify to his findings at any scheduled hearing on this
application.

*See* Turi Expert Report annexed to Turcotte Decl. as Exhibit "9", at 1. Hence, under the "ordinary observer" standard (*see* Point B(1), *infra*), there can be no question that the Remy Diamond infringes upon the '097 Patent.

Indicative that the infringement was not mere happenstance but willful and wanton, Sanjay Khapre, a former Grosbard employee, attests to the fact that Grosbard was surreptitiously manufacturing and attempting to reverse engineer a diamond that defendant Ritesh Shah, a former-Gem-Int'l- salesman-turned-Grosbard-agent, readily compared to "[Gem Int'l principal] Navin Shah's [diamond]" – directing Khapre to tell no one -- and explicitly identified the *Jubilant Crown®* clientele as his targeted market. *See* Khapre Decl. annexed to Turcotte Decl. as Exhibit "10", at ¶¶3-5.

2.  Trade Dress Infringement/False Designation of Origin

In order to prevail on a claim for false designation of origin with respect to trade dress under §43 of the Lanham Act,[4] a plaintiff must prove (i) that the product is distinctive as to the source of the good, i.e., demonstrates "secondary meaning", and (ii) that there is a likelihood of confusion between its good and the defendant's. *See*, *e.g.*, *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001). Relative to the first point, in determining whether trade dress has acquired secondary meaning, the court looks to such factors as length and exclusivity of trade

---

[4] As recognized by the courts in this Circuit, "[b]ecause the standards for analysis of plaintiffs' New York state law claims are the same as those for analysis of the Lanham Act claims in all relevant respects, the following discussion is equally applicable to both sets of claims." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F.Supp.2d 165, 177 n.6 (S.D.N.Y. 2004); *see also Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F.Supp. 470, 472 n.1 (S.D.N.Y. 1998)("The Court's analysis under the New York General Business Law is the same as under the Lanham Act")(citing *Princeton Graphics Operating, L.P. v. NEC Home elecs. (U.S.A.), Inc.*, 732 F.Supp. 1258, 1267 (S.D.N.Y. 1990)("the standards for a violation under Section 350-d [of the New York General Business Law] are substantially the same as under section 43(a) [of the Lanham Act]"). Accordingly, plaintiff's analysis here is applicable to its state law claims as well.

dress use, sales success and advertising expenditures. *See, e.g., Omega, S.A. v. S & N Jewelry Inc.*, 1992 WL 142746, *6 (S.D.N.Y. June 8, 1992). In addition, "[e]vidence that the trade dress or product design was intentionally copied by a competitor can support an inference of secondary meaning if the circumstances indicate an intent to benefit from the good will of the prior user through confusion." Id. at *7 (citations omitted); *Swatch, S.A. v. Siu Wong Wholesale*, 1992 WL 142745, *6 (S.D.N.Y. June 8, 1992). As to the second point, "only the likelihood of confusion need be shown, and not proof of actual confusion." *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981); *see Swatch, supra*, at *7-8 (finding a likelihood of success on the merits and granting preliminary injunction despite plaintiffs producing no evidence of actual confusion). Moreover, "[t]he test for likelihood of confusion is whether a '**reasonably prudent consumer**' in the marketplace is likely to be confused as to the origin of the good or service." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)(emphasis added).

Here, there can be little dispute that Gem Int'l has established both "secondary meaning" and confusion in the marketplace. As previously noted, while operating for more than five (5) years under its exclusive licensing agreement, Gem Int'l has firmly established its distinctive and recognized imprint on the *Jubilant Crown*® diamond cut, both as a result of costly national advertisements generated by Gem Int'l and its coterie of authorized retailers, in addition to the diamond being featured in established industry trade publications such as *Rapaport Diamond Report*, *Modern Jeweler*, *Southern Jewelry News* and *National Jeweler*.

As for confusion created by the Remy Diamond within the diamond industry, plaintiff has provided ample expert testimony attesting to the diamonds' sameness to the trained eye, in addition to sworn statements from persons having firsthand knowledge of uncertainty by

experienced retail buyers as to the distinction between the *Jubilant Crown*® and Remy Diamond. *See* Parag Shah Decl. annexed to Turcotte Decl. as Exhibit "4", at ¶¶7-10. If such seasoned industry insiders cannot discern the difference, the *likelihood* of confusion among ordinary, inexperienced, reasonably prudent consumers trying to identify the difference with the naked eye is all the more certain. *See* Turi Expert Report annexed to Turcotte Decl. as Exhibit "9", at 4-5.

### 3. Unfair Competition

As a companion to Gem Int'l's trade dress infringement claim, "under the New York common law of unfair competition, a plaintiff need not establish secondary meaning in order to prevent a competitor from using a confusingly similar trade dress where the competitor is engaged in palming off, actual deception, appropriation of the plaintiff's property, or deliberate copying of a trade dress." *Omega*, *supra*, at *7 (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir. 1992)); *see also Yurman Design, Inc. v. PAJ, Inc.*, 93 F.Supp.2d 449, 463 (S.D.N.Y. 2000)(common law unfair competition claims "essentially track[ ]" Lanham Act claims). "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Kraft General Food, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 135 (S.D.N.Y. 1993)(citations omitted).

Here, there can be no serious question that Grosbard, given its longstanding presence in the diamond industry and the *Jubilant Crown*®'s prominence in the marketplace, was on actual and constructive notice of the *Jubilant Crown*®'s existence when, with the assistance of two former Gem Int'l salesmen with intimate knowledge of the '097 Patent,[5] it misappropriated the diamond design and created a knock-off with the addition of a handful of superficial cuts to the

---

[5] In addition to defendant Ritesh ("Ricky") Shah, his brother Amish Shah was also once employed by Gem Int'l and is now be employed in a management position with Grosbard.

design patent at the diamond face's margins.  Plaintiff has produced the sworn testimony of one witness who was told by one of the Gem Int'l employees-turned-Grosbard hire, Ricky Shah, that he intended to market this iteration of "Navin Shah's diamond" to the *Jubilant Crown®* clientele.  *See* Khapre Decl. annexed to Turcotte Decl. as Exhibit "10", at ¶5.

    B.  Plaintiff Has Established Irreparable Injury

        1.  <u>Patent Infringement/Doctrine of Equivalents</u>

"Where a patent holder makes a 'clear or strong showing' of infringement and validity, irreparable injury is presumed." *Giantceutical, Inc.*, 356 F.Supp.2d at 381; *Elite Licensing, Inc.*, 250 F.Supp.2d at 389.  Here, there can be no serious dispute about the `097 Patent's validity. The design '097 Patent was issued to Edwin Cutshall on June 26, 2001, based on an application Ser. No. 29/129,713, filed on September 18, 2000.  *See* Exhibit "1" to Turcotte Decl.; Exhibit "3", Cutshall Decl., at ¶1.  35 U.S.C. § 173 provides that "[p]atents for designs shall be granted for the term of fourteen years from the date of grant."  Further, there can be no dispute that at the time that Shama Gems d/b/a Gem International entered into its exclusive licensee agreement with Edwin Cutshall, in May of 2002, that Gem Int'l was the legal assignee of the `097 Patent and would so remain, subject the licensing agreement's terms and conditions, until the patent's termination in June 2015.  *See* Exhibit "2" to Turcotte Decl., at ¶¶2.1, 8.1.  Moreover, Cutshall, the patent inventor and owner, has attested to the fact that (i) "[t]he only valid licensing agreement relating to the manufacture, marketing and sale of the '097 Patent is, and has been to date, between Shama Gems, Inc., doing business as Gem International, and myself ", and (ii) "I have never entered into a licensing agreement with any of the defendants, nor have any of the defendants ever been authorized to utilize the '097 patent."  *See* Exhibit "3" to Turcotte Decl., Cutshall Decl., at ¶¶6-7.

Here, Gem Int'l has provided ample proof that defendants have infringed upon the '097 Patent by admittedly attempting to modestly alter an intricately and uniquely designed diamond by adding a handful of superficial facets to the diamond face's outer edge. *See* Defense Counsel's Letter dated June 28, 2007, annexed to Turcotte Decl. as Exhibit "12", arguing that defendants' addition of eight facets to the *Jubilant Crown*®'s girdle region, sufficiently altered the "side profile" of the diamond. This despite expert opinion that such modifications were not only "indiscernible", even with the aid of magnification, but that such diamonds "are rarely, almost never, viewed by consumers outside of a mounting" that "would make it impossible to view from the side." *See* Turi Expert Report annexed to Turcotte Decl. as Exhibit "9", at 4. Defendants suggestion that they can circumvent a patented jewelry design by adding a handful of trifling cuts to the diamond's periphery is no more compelling than the notion that one can overcome established, intellectual property rights by, adding a few brushstrokes to the *Mona Lisa* or changing a bar of *The Star Spangled Banner*, a concept that has been soundly rejected in the Second Circuit. As the court observed in *Yurman Design, Inc. v. PAJ, Inc.*, 93 F.Supp.2d 449, 457 (S.D.N.Y. 2000):

> To accept PAJ's argument that Yurman's pieces of jewelry are merely unprotectable agglomerations of basic design elements already within the public domain would be akin to accepting the position that every song is merely a collection of basic notes, every painting a derivative work of color and stroke, and every novel merely an unprotected jumble of words. *Cf. Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995)('As the district court noted, if we took this argument [that court was required to dissect copyrighted designs into separate components] to its logical conclusion, we might have to decide that 'there can be no originality in a painting because all colors or paint have been used somewhere in the past.')

*See also Weindling Int'l v. Kobi Katz, Inc.*, 2000 WL 1458788, *2 (S.D.N.Y. Sept. 29, 2000)(quoting same). As the *Weindling* court further opined, similarly in the case of a disputed diamond design:

12

> Artistic design, after all, is at the very heart of the jewelry business . . . [and
> diamond rings] are chiefly works of art, or more precisely ornamental sculpture,
> even if mass-produced . . . [W]here, as here, Weindling has *more or less exactly
> copied that design, infringement has occurred* and liability must be found.

*Id.* at *4 (granting permanent injunction and ordering jury empanelled to determine

damages)(emphasis added).

Indeed, in assessing design patent infringement, the competing products must not be

evaluated on the design's overall appearance and not on individual features or facets (no pun

intended). As the Supreme Court first announced in *Gorham Co. v. White*, 81 U.S. (14 Wall.)

511, 526-28 (1872), relative to assessment of rival designs:

> We are now prepared to inquire what is the true test of identity of design. Plainly,
> it must be sameness of appearance, and *mere difference of lines in the drawing
> or sketch, a greater or small number of lines, or slight variances in
> configuration, if sufficient to change the effect upon the eye, will not destroy
> the substantial identity*. An engraving which has many lines may present to the
> eye the same picture, and to the mind the same idea or conception as another with
> much fewer lines. *The design, however, would be the same*. . . .

> . . . [T]he only remaining question . . . is, whether it is essential that the
> appearance should be the same to the eye of an expert. *The court below was of
> opinion that the test of a patent for a design is not the eye of an ordinary
> observer. . . . With this we cannot occur. Such a test would destroy all the
> protection which the act of Congress intended to give. There never could be
> piracy of a patented design, for human ingenuity has never yet produced a
> design, in all its details, exactly like another*, so like, that an expert could not
> distinguish them. . . .

> We hold, therefore, that if, *in the eye of an ordinary observer*, giving such
> attention as a purchaser usually gives, two designs are *substantially the same*, if
> the resemblance is such to deceive such an observer, inducing him to purchase
> one supposing it to be the other, *the first one patented is infringed by the other*.
> (emphasis added)

*See also Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed.Cir. 1988)(using ordinary

observer standard). Here, expert Andrew Turi found that "it is beyond credibility that a

consumer would be able to distinguish between the Jubilant Crown and Remy Diamond." *See* Turi Report annexed to Turcotte Decl. as Exhibit "9", at 4.

Nor does the fact that defendants have apparently increased the number of facets to the diamond face's periphery alter this finding of infringement.  The Court of Appeals for the Federal Circuit has recognized the applicability of the time-honored doctrine of equivalents, embodied in the seminal case of *Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 608 (1950), to design patent cases, by recounting the following holding:

> We are mindful of the oft-quoted words of the Supreme Court in *Graver Tank* . . .
> .
> One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy.  Outright and forthright duplication is a dull and very rare type of infringement.

*Lee*, 838 F.2d at 1190 (quoting *Schnadig Corp. v. Gianes Mfg. Co.*, 494 F.2d 383, 391-92 (6th Cir. 1974)).  More recently, the U.S. Supreme Court once again recognized that a party's attempt to circumvent a patent by means of making inconsequential changes violates the doctrine of equivalents, by which "[t]he scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 732 (2002).  The *Festo* Court further held that "[t]he exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it varying its form or proportions". *Id.* (quoting *Winans v. Denmead*, 56 U.S. (15 How.) 330, 347 (1854)).  Addressing the very circumstances that *defendants contend* are present here, the *Festo* Court ruled that "patent claims must protect the inventor not only from those who produce devices falling within the literal claims of the patent but also from copyists who '***make unimportant and insubstantial changes and substitutions in the patent*** which, though adding

nothing, would be enough to take the copied matter outside the claim and hence outside the reach of law'." *Id.* at 732-33 (quoting *Graver Tank*, 339 U.S. at 607)(emphasis added).

### 2. Trade Dress Infringement/False Designation of Origin

"In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm."[6] *Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F.Supp.2d 412, 418 (S.D.N.Y. 2004)(quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995)); *see also Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.Supp.2d 217, 253 (S.D.N.Y. 2004)(quoting same). As discussed above, the plaintiff has provided ample expert analysis and lay sworn testimony to firmly establish the likelihood of confusion, and hence irreparable harm, as a result of defendants' obvious knockoff of the *Jubilant Crown*® diamond.

Moreover, plaintiff will be further irreparably harmed insofar as the defendants tortiously interfere with existing business contracts and prospective business opportunities by siphoning off or diverting orders of the *Jubilant Crown*® from Gem Int'l. Upon information and belief, Grosbard has already sold substantial orders for the diamond, under the "Remy Diamond" name, by virtue of the defendants' showcasing their diamond cut at prominent tradeshows. *See* Parag Shah Decl. as Exhibit "4", at¶¶7-13. Beyond such economic setbacks, Grosbard's actions constitute wholesale misappropriation of the plaintiff's intellectual property rights, diminishing the quality, value, marketability and imprimatur of the patented product and glutting the market with a diamond that is *less than* a patent-protected product.

---

[6] The likelihood of confusion is also the barometer for irreparable harm under an unfair competition claim, and therefore the same analysis applies to that cause of action. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.Supp.2d 217, 253 (S.D.N.Y. 2004).

Upon the facts set forth above, it is respectfully submitted that Gem Int'l has suffered and will continue to suffer irreparable harm if the defendants are <u>not</u> ordered: (i) to cease making, using, selling, importing, offering for sale or licensing any products that infringe any claim of United States Design Patent No. 444,097 S, and (ii) to cease interference with plaintiff's business relations and opportunities.

C. Balance of Hardships Favors Plaintiff

Likewise, the fact that defendants are capitalizing on the novelty of this diamond cut by improperly soliciting and obtaining significant business from nationally recognized jewelers, while Gem Int'l and Cutshall – as the legal patent holders – incur these lost profits, amply establishes that the balance of hardships tips in the plaintiff's favor.

> 'In considering the balance of hardships, the Court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted.' *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F.Supp. 397, 408 (D.Del. 1989)(citing *Hybritech*, 849 F.2d at 1457), *aff'd*, 904 F.2d 45 (Fed.Cir. 1990). **The magnitude of the threatened injury to the patent owner should be considered in light of the strength of the showing of the likelihood of success on the merits.** *See H.H. Robertson*, 820 F.2d at 390.

*Elite Licensing, Inc.*, 250 F.Supp.2d at 390 (emphasis added). Here, in view of plaintiff's proffered expert opinion and witness statements, the likelihood of the plaintiff succeeding on the merits outweighs any hardship that might befall defendants via imposition of the injunction.

D. Defendants' Conduct Creates an Adverse Impact on Public Interest

Plaintiff's causes of action for trade dress infringement and false designation of origin accentuates another element which militates in favor of granting plaintiff's application for a preliminary injunction: the public's interest in not only preserving the rights of patent holders but the right of consumers to rely upon patented products, in stark contrast to the confusion among the diamond retailers and the general public regarding the quality and legality of defendants'

16

diamond product. *See*, *e.g.*, *Swatch*, *supra*, at *7 (granting preliminary injunction insofar as "given the substantial similarity in appearance between plaintiffs' and defendants' watches, it is readily apparent that defendants intended to convey the impression that the watches they have been selling are associated with plaintiffs").

Here, the fact that, in addition to defendants' direct sales contracts with customers employing plaintiff's former salesmen, defendants have, upon information and belief, attempted to sell the infringing product to retailers under the knowing subterfuge that it had legally obtained the design patent rights and/or the misrepresentation that defendants' patent was pending (*see* Parag Shah Decl. as Exhibit "4", at ¶6), only serves to cause widespread confusion and problems for those parties contracting for the diamond and thus creates an adverse impact on the public as a whole. "The public interest favors the protection of the rights secured by valid patents." *Elite Licensing, Inc.*, 250 F.Supp.2d at 390 (citation omitted).

## CONCLUSION

For the foregoing reasons, the plaintiff has demonstrated the necessity for defendants to be temporarily restrained from the manufacture, marketing and sale of their Remy Diamond as a result of their patent infringement, trade dress infringement, false designation of origin, unfair competition and/or its violation of New York statutory laws. To deny such injunctive relief would be to inequitably permit defendants to continue "to reap where [they] ha[ve] not sown." *Warner Bros.*, *Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 80 (2d Cir. 1981)(quoting *Int'l News Service v. Associated Press*, 248 U.S. 215, 239 (1918)).

Dated:   New York, New York
             October 19, 2007

THE LAW OFFICE OF CHRISTOPHER
B. TURCOTTE, P.C.

Christopher B. Turcotte, Esq. (CT-0867)
Bjorn J. Holubar, Esq. (BH-9691)
575 Madison Avenue, Suite 1006
New York, New York  10022
*Attorney for Plaintiff*